UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

AHMAD MOUSSA, SAZIA PATEL, UMAHANI MS.
HAMAD, MARIO FONG, AMROU MR. IBRAHIM,
AHMED BOUKENDAKDJI, SANDY GARCIA,
CEDAR SKLAR-LUERS, JOHN DOES and JANE
DOES

                              Plaintiffs,

              v.

CITY OF NEW YORK, a municipal entity; ERIC
ADAMS, in his individual capacity; EDWARD
CABAN, in his individual capacity; TERENCE A.
MONAHAN, in his individual capacity; DET.
THOMAS LANE, MICHAEL BUTLER, DOUGLAS
SCHACK, ELIZABETH MEDINA, ANIBAL
VASQUEZ, MANUEL GUTIERREZ, SEJDI
COBAJ, JOHN and JANE DOE officers 1-10, police
Officers in their individual and official capacity,

                              Defendants.
------------------------------------------------------------X

**FIRST AMENDED
COMPLAINT**


**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.      The murder of George Floyd in Minneapolis, Minnesota sparked peaceful marches

across America, especially in the City of New York.

2.      What followed was a NYPD crackdown against the peaceful marchers, culminating

in the most heinous of NYPD officer misconduct on June 4, 2020 in the South Bronx neighborhood

of Mount Haven.

3.      On December 7, 2020, many of the Mount Haven peaceful marchers filed a class

action lawsuit alleging several civil rights violations and injuries resulting from NYPD action

commonly known as kettling – a mechanism officers use to encircle and trap peaceful marchers

from movement and at the same time demanding that the peaceful marchers disband for breaking curfew or comply with dispersal orders.

4.    Unable to obey NYPD Officer orders because NYPD Officers encircled peaceful marchers, NYPD officers proceeded to forcibly arrest peaceful marchers for allegedly failing to follow orders.

5.    Three years after the Mount Haven kettling case – *Sierra v. City of New York*, 20-cv-10291 – the New York City Police Department engaged in precisely the same action they were claiming to be abating.

6.    In the wake of the October 7, 2023 attack on Israel, Israel Defense Fund ("IDF") unleashed fierce, deadly mass killing attacks against the people of Gaza in retaliation to the Hamas October 7th attack, sparking worldwide pro-Palestinian and pro-Israel marches.

7.    New York City's Mayor Eric Adams, in an attempt to pre-empt the exercise of free speech for Pro-Palestinians, while fostering the pro-Israeli free speech, called would-be peaceful marchers supporters of terrorists and vowed to use his executive might to crush those who opposed his pre-determined views on civil peaceful marchers.

8.    On October 21, 2023, *Within Our Lifetime*, a civic engagement organization, held a lawfully permitted march in the heavily Arab and Muslim Brooklyn neighborhood of Bay Ridge to denounce the killing of innocent civilians.

9.    Under the direction of Mayor Adams, hundreds of NYPD police officers were deployed to this peaceful march. They intentionally began to prepare in line, like in Mott Haven. The NYPD pushed the crowd of nearly fifty thousand for a kettling arrest trap as the marchers neared the end of their event.

10.    The Plaintiffs in this action represent many of those profiled, wrongfully arrested,

beaten, choked, harassed, discriminated against, humiliated and much more on October 21, 2023 by NYPD Officers.

## NATURE OF THE ACTION

11.    This lawsuit seeks the lawful redress of the civil rights violations against the October 21, 2023 Bay Ridge peaceful marchers.  This action seeks a judgment declaring the NYPD and Mayor Adams' actions as in part racially, national origin and religiously motivated against the Arab, Palestinian, Pro-Palestinian, and Muslim voices in violation of their First Amendment Rights.  Mayor Adams, on behalf of the City of New York, intentionally directed the NYPD to exercise extra judicial force in violation of the Plaintiffs' constitutional rights that demand compensatory and punitive damages for their injuries.  This action also seeks redress against Mayor Adams in his individual capacity for using his position as Mayor of New York to extrajudicially target the Arab, Palestinian, Pro-Palestinian, and Muslim voices for political expediency.

12.    NYPD Officers violated Plaintiffs' rights at the direction of the Mayor, unjustly used excessive force, assaulted, battered, and abused Plaintiffs. Defendants violated Plaintiffs' procedural and substantive due process rights.  As a result, Plaintiffs suffered and continue to suffer from their enumerated injuries.

13.    The City of New York is liable for its deliberate indifference and negligence with respect to customs, policies and practices, and failure to supervise and discipline police officers, ultimately creating conditions that permitted, condoned, and preserved an environment in which the most violent police officer believed he would be insulated from swift and effective investigation, prosecution, and conviction for his/her most brazen acts of brutality.  The inevitable result of this institutional, repeated indifference is the extraordinary physical and emotional

injuries inflicted upon Plaintiffs.

### JURISDICTION

14.     This Court has jurisdiction over Plaintiffs' civil rights claims brought under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), (4).

15.     Plaintiffs' claim for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202; Rule 57 of the Federal Rules of Civil Procedure; and the Court's inherent equitable authority.

16.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), since Plaintiffs' federal and state law claims arise from a common nucleus of operative facts and are so intertwined as to make the existence of supplemental jurisdiction over the state law claims appropriate.

17.     On January 18, 2024, within 90 days after the claims herein arose, Plaintiffs served a Notice of Claim setting forth the name and addresses of the Plaintiffs and of their attorneys, the nature of the claim, the time when, the place where, and the manner in which the claim arose, and the items of damage and injuries claimed to have been sustained for far as then practicable, upon the City of New York.

18.     This action is commenced within one year and 90 days after the claims herein arose.

19.     Hearings pursuant to General Municipal Law 50-H were held for all Plaintiffs.

20.     50-H hearings were held for the Plaintiffs on June 10, 2024 (Boukendakdji), June 11, 2024 (Sklar-Leurs), June 25, 2024 (Moussa), June 13, 2024 (Mr. Ibrahim),  June 20, 2024 (Patel), October 2, 2024 (Garcia), October 3, 2024 (Mr. Fong), and December 3, 2024 (Ms. Hamad).

21.     At least 30 days have elapsed since the service of the aforesaid Notice of Claim, and adjustment or payment thereof has been neglected or refused.

## VENUE

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), as Defendant Cit of New York resides in this district.

## JURY DEMAND

23.     Plaintiffs demand a jury trial on each and every claim to which they are legally entitled to a jury.

## PARTIES

24.     SANDY GARCIA is a citizen and resident of the State of New York and at all relevant times, is a resident of the City of New York.

25.     UMAHANI HAMAD is a citizen and resident of the State of New York and at all relevant times, is a resident of the City of New York.

26.     MARIO FONG is a citizen and resident of the State of New York and at relevant times, is a resident of the City of New York.

27.     AMROU IBRAHIM is a citizen and resident of the State of New Jersey and at all relevant times, is a resident of the City of Nutley.

28.     AHMAD MOUSSA is a citizen and resident of the State of New York and at all relevant times, is a resident of the City of New York.

29.     SAZIA PATEL is a citizen and resident of the State of New York and at all relevant times, is a resident of the City of New York.

30.     AHMED BOUKENDAKDJI is a citizen and resident of the State of New York and at all relevant times, is a resident of the City of New York.

31.    CEDAR SKLAR-LUERS is a citizen and resident of the State of New York and at all relevant times, is a resident of the City of New York.

32.    They are hereinafter the Plaintiffs shall be referred to as "the named Plaintiffs," or "Plaintiffs."

33.    Defendant CITY OF NEW YORK ("the City") is a municipal entity created and authorized under the laws of the State of New York.

34.    The City is authorized by law to maintain a police department and does maintain the New York City Police Department (referred to herein as "the NYPD"). The NYPD acts as the City's agent and the City assumes the risks incidental to the maintenance of a police department and the employment of police officers.

35.    Defendant ERIC ADAMS was, at all times relevant to this Complaint, the Mayor of the City of New York. He is sued in his individual capacity.

36.    Defendant EDWARD CABAN was, at all times relevant to this Complaint, the Police Commissioner for the NYPD. He is sued in his individual capacity.

37.    Defendant TERENCE A. MONAHAN was, at all times relevant to this Complaint, the Chief of Department for the NYPD. He is sued in his individual capacity.

38.    Defendants ADAMS and MONAHAN are referred to collectively as "the City Officials."

39.    DET. THOMAS LANE, DOUGLAS SCHACK, ELIZABETH MEDINA, ANIBAL VASQUEZ, MICHAEL BUTLER, MANUEL GUTIERREZ, SEJDI COBAJ and all other JOHN DOES and JANE DOES were, at all times relevant to this Complaint, Police Officers with the NYPD. They are sued in their individual capacities. They are referred to collectively as "the individual officers" or "officers."

40.     At all times relevant herein, the City Officials and individual officers were employed by the City and acted under color of law in the course and scope of their duties and authority as officers, agents, servants, and employees of the NYPD and the City.

41.     At all relevant times, the City Officials and individual officers violated the established rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and the New York Constitution of which reasonable officials in their respective circumstances would have known.

42.     At all times relevant to this Complaint, the City Officials were high-level officials of the City of New York who had authority to establish policy for the City and the NYPD.

43.     Section 3 of the New York City Charter provides: "The mayor shall be the chief executive officer of the city."

44.     Section 8 of the City Charter provides that the Mayor "shall exercise all the powers vested in the city" and "shall be responsible for the effectiveness and integrity of city government operations and shall establish and maintain such policies and procedures as are necessary and appropriate to accomplish this responsibility."

45.     Section 431 of the City Charter provides: "There shall be a police department the head of which shall be the police commissioner."

46.     Section 431 further provides that the Police Commissioner "shall be appointed by the mayor" and "may be removed from office" by the Mayor.

47.     Section 434 of the City Charter provides that the Police Commissioner "shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department."

48.     Section 434 further provides that the Police Commissioner is the "chief executive officer of the police force" and "shall be chargeable with and responsible for the execution of all laws and the rules and regulations of the department."

49.     The NYPD Chief of Department is the highest-ranking uniformed officer in the NYPD. All uniformed members of the NYPD are required to follow orders issued by the Chief of Department.

50.     The NYPD Chief of Department oversees and supervises all NYPD operations, including patrol operations.

51.     The City of New York is liable under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), when the policies, practices, and customs established and/or implemented by the City Officials are the moving force of a constitutional violation.

## STATEMENT OF FACTS

### I.    Mayor Adam's Charged Statements and Opinions Favoring One Segment of His Constituency Over The Other.

52.     On August 20, 2023, Mayor Eric Adams boarded an airplane for his first visit to Israel as a Mayor.

53.     Though not Israeli himself, during the trip, Mayor Adams, affirmed an "..unbreakable bond [between] New York and Israel," and intended to acquire technological insight and address efforts to combat Palestinians and their supporters who were speaking out against the destruction of homes, death to civilians, and ethnic cleansing of Palestinians.

54.     At an October 10, 2023 rally named "New York Stands with Israel," Mayor Adams claimed, among other things, that "[w]e are not all right when right here in the City of New York you have those who celebrate at the same time when the devastation is taking place in our city."

55.    Mayor Eric Adams made various statements during that speech to show his intention to use the New York Police Department to fulfil his agenda to crush any peaceful protests expressing solidarity with Palestinians.

56.    He openly referred to peaceful marchers as "disgusting." He referred to the peaceful marchers as "extremists" who "celebrated" or supported terrorism.

57.    Since the event, the NY Post reports Mayor Adams to say the following about pro-Palestinian rallies:

> Adams said he doesn't believe people should be able to "just take over our streets and march in our streets."
>
> "I don't believe people should be able to take over our bridges," he continued.
>
> "I just don't believe you can run a city this complex where people can just do whatever they want."[1]

58.    However, Mayor Adams has allowed and participated in pro-Israeli rallies.

59.    Mayor Adams condemns pro-Palestinian protests where he ordered kettling, beating and false arrests without any provocation.

60.    Mayor Adams' statements and opinions are not only part of his personal biases but exemplifies institutional biases in the City of New York and NYPD of favoring one segment of society over another

61.    As far back as September 2012, the NYPD opened an Israeli branch at the Sharon District Police Headquarters "because the Israeli police is one of the major police forces with which it must maintain close work relations and daily contact."

62.    According to the Deadly Exchange, a political campaign and online watchdog, "the

---

[1] *Mayor Adams sounds alarm on NYPD BLM settlement as ant-Israel protests rage: 'Very troubling,'* NY Post, December 26, 2023

Israeli police have looked to New York for their 'broken window' model of community policing.

63.    The NYPD's infamous 2002 "Demographic Unit" that surveilled Muslims for "basic acts of daily living" paralleled "tactics used to police and occupy Palestinians," as demonstrated by NYPD's "sending officers to Israel for trainings and sharing surveillance information with Israeli agencies, both directly and through trips facilitated by non-governmental organizations."

64.    As most recently as 2023, Mayor Adams, in continuation of this "unbreakable bond," "vow[ed] to [b]ring [w]hat [h]e's [l]earned [f]rom Israel Police [b]ack to the NYPD."

65.    In October of 2023, Mayor Adams falsely accused pro-Palestine marchers as seeking to exterminate Jewish people. With his statements, the Mayor created an atmosphere of hostility that incited violence against peaceful Pro-Palestinian marchers.[2] Mr. Adams used his position as a Mayor to expose Pro-Palestinian marchers to threat of violence and hate when he stated peaceful marchers should "not use our streets to spread your hate."[3]

66.    Mayor Adams' biased characterization that pro-Palestinian activists are hateful or supporting terrorism is in direct conflict with reports by the International Court of Justice,[4] Amnesty International,[5] and Human Rights Watch,[6] and which all make clear the same thing that pro-Palestinian marchers are saying: Palestinians are entitled to basic human rights.

---

[2] On national TV, Eric Adams falsely accuses DSA of carrying swastikas and calling for extermination of Jews - City & State New York
[3] Mayor Eric Adams on X: "At a moment when innocent people are being slaughtered and children kidnapped in Israel, it is disgusting that this group of extremists would show support for terrorism. I reject this. New York City rejects this. Do not use our streets to spread your hate." / X
[4] The Court gives its Advisory Opinion and responds to the questions posed by the General Assembly
[5] Israel/Occupied Palestinian Territory: 'You Feel Like You Are Subhuman': Israel's Genocide Against Palestinians in Gaza - Amnesty International
[6] World Report 2024: Israel and Palestine | Human Rights Watch

## II.    *Within Our Lifetime* Holds a Peaceful Annual March To Bring Attention To The Plight of Palestinians in Gaza

67.    Bay Ridge maintains New York's largest Arab and Muslim population and is home to New York's "Little Palestine."[7]

68.    In recent years, *Within our Lifetime* organized similar marches in Bay Ridge to commemorate the "Nakba," translated as "catastrophe," in which hundreds of thousands of Palestinians were forced from their homes as part of the founding of the state of Israel.[8]

69.    Indeed, Bay Ridge hosted another march to commemorate the Nakba in May of 2024, which was met with the same tactics and violence as the march a few months prior.[9]

70.    On October 21, 2023, just ten days after Mayor Adam's speech at the New York Stands with Israel rally, *Within Our Lifetime* held a peaceful march ("event") in the Bay Ridge neighborhood of Brooklyn, New York.

71.    The October 21, 2023 march was known to the City of New York and the NYPD because *Within Our Lifetime* obtained a permit for the march from the NYPD.

72.    The march began at or around the early afternoon and ended prematurely by police action around sunset on October 21, 2023.

73.    Though NYPD Officers were present at the beginning of the peaceful march, the number of NYPD Officers surged at the end of the march in comparison to the number present at the start of the event.

74.    The march garnered a crowd of nearly fifty thousand people.

75.    As the peaceful march was coming to an end, the NYPD, including the Strategic

---

[7] 'These Are Our Streets:' Finding Home in Bay Ridge's Little Palestine | The Indypendent
[8] At Chaotic Rally in Brooklyn, Police Violently Confront Protesters - The New York Times
[9] New York police violently arrest pro-Palestine protesters marking Nakba | Israel-Palestine conflict News | Al Jazeera

Response Group, blocked marchers' access to an open park that they were going to use to disperse and instead the NYPD directed the crowd to move off the streets and onto the already crowded sidewalk ("the October 21 Operation").[10]

76.    Had the crowd been allowed to walk just across the street to the park, people would have simply gone home or at least been off Fifth Avenue where they had been lawfully marching.

77.    Unable to move across the street to the park for the marchers to go home, NYPD Officers then warned that any person that remained on the street and failed to move to the sidewalk would be arrested.

78.    March organizers immediately began directing the crowd off the streets as police had instructed. They also cautioned the police that it was impossible to move that many people onto an already overflowing sidewalk.

79.    However, the NYPD Officers continued to kettle the crowd, a practice that involves enclosing individuals with the intent to take police action without individualized probable cause.

80.    The crowd of fifty thousand then began attempting to move to the sidewalk as directed, but for many it was ultimately to no avail because there were far too many people and nowhere to move as the crowd was kettled by officers and their vans.

81.    The NYPD officers knew the entire crowd could not move to the sidewalk in a such short period of time. Yet mere minutes after announcing the crowd to move to the sidewalk, NYPD officers began delivering a ferocious assault against the peaceful marchers.

82.    NYPD Officers pushed peaceful marchers into one another.

83.    NYPD Officers grabbed minors from their parents and slammed them to the ground.

---

[10] 'My brothers and sisters are being killed': Scenes from a Bay Ridge rally for Palestine - BKMAG

84.    NYPD Officers engaged in excessive force in detaining and arresting Plaintiffs and other peaceful marchers.

85.    The excessive force and assaults and battery included but were not limited to slapping Plaintiffs, choke-holding Plaintiffs, punching Plaintiffs, removing religious garments off Plaintiffs, and pressing their knees to the neck of Plaintiffs.

86.    While NYPD Officers carried out the October 21 Operation, NYPD Officers laughed at the peaceful marchers as they collared and assaulted them; many of the peaceful marchers and Plaintiffs were crying hysterically during this period.

87.    Plaintiffs feared for their lives and serious injury due to the callous behavior of the officers.

88.    All Plaintiffs were assaulted by members of the NYPD.

89.    All Plaintiffs were falsely arrested and detained against their will and taken to One Police Plaza ("1PP").

90.    Plaintiffs were severely restrained and injured by handcuffs on their way to 1PP.

91.    The Plaintiffs were falsely charged with failure to disperse, PL 240.20(6), and disorderly conduct, among other things.

92.    Upon information and belief, the charges against the Plaintiffs were merely a pretext to unlawfully disrupt Plaintiffs' constitutionally protected rights and remove them from the peaceful march though they had done nothing wrong.

93.    Upon information and belief, all of the charges have been dismissed because prosecutors declined to prosecute.

94.    Upon information and belief, the symbolic Palestinian scarfs that some Plaintiffs were wearing were confiscated and NYPD Officers refused to return them.

95.     Two Plaintiffs, Sazia Patel and Umahani Hamad, were wearing these symbolic Palestinian scarfs, with Ms. Patel wearing it as a religious garb known as "hijab." Both Ms. Patel and Ms. Hamad were wearing hijabs that were unlawfully removed in violation of their sincerely held religious beliefs.

96.     The removal of the hijabs from these women and the confiscation of the scarves was motivated by ethno-racial and religious animus.

97.     Upon information and belief, NYPD Officers made derogatory statements against the Plaintiffs and other marchers based on their perceived national origin and religion or for expressing their political views to support the Palestinian cause.

98.     Upon information and belief, Plaintiffs were falsely arrested and were not read their Miranda rights during their arrest.

99.     The Plaintiffs were falsely detained, not free to leave, without access to legal assistance.

100.    Upon information and belief, the NYPD Officers involved in the arrests, assaults and battery were from the 68th precinct and/or the Strategic Response Group.

**Umahani. Hamad**

101.    Umahani Hamad ("Hamad") is an observant Muslim woman who wears a hijab, a religious head covering, in accordance with her sincerely held beliefs. Ms. Hamad believes that she cannot remove her hijab nor uncover her hair around males she is not directly related to.

102.    Ms. Hamad suffers from asthma and uses a rescue inhaler.

103.    Ms. Hamad arrived at the rally at around 5:00 pm.

104.    At the end of the rally, around sunset, the crowd began to disperse.

105.    However, NYPD vehicles and personnel blocked off intersections and other exits.

NYPD Officers lined up and slowly began marching in on the crowd, which now had nowhere to go.

106.    As NYPD officers advanced into the crowd, they repeatedly pushed Ms. Hamad into other people. Ms. Hamad witnessed children getting trampled because of the NYPD kettling.

107.    One NYPD officer wearing a white uniform shirt suddenly shoved Ms. Hamad, with enough force that it would have knocked her over, had there been any space to fall. Ms. Hamad told the officer, "Don't push me, you're trampling us."

108.    In response, the officer ordered her subordinates, "Get her," referring to Ms. Hamad. Obeying the command, over ten NYPD officers attacked Ms. Hamad. They grabbed her from the crowd and threw her to the ground. Officers pulled her hijab off, which they left hanging around her neck.

109.    The NYPD Officers violently placed handcuffs behind Ms. Hamad's back extremely tight, causing lacerations on her wrists.  She was later put in zip ties, which were even tighter. She could not put her hijab back on.

110.    Ms. Hamad begged NYPD officers to allow her to cover her head to comply with her religious duties. The NYPD refused, leaving her hair exposed in public for several minutes.

111.    Ms. Hamad was not read her Miranda rights, nor was she told what she was being charged with.  Ms. Hamad's arresting officer was Anibal Vasquez, Tax Reg. 955624.

112.    Ms. Hamad was placed on an NYPD bus with other rally participants. Because of the tight quarters, exertion, and her discomfort from the arrest, she began to have an asthma attack.

113.    Gasping for air, Ms. Hamad repeatedly told NYPD officers that she couldn't breathe. The officers told her they couldn't do anything to help her. Ms. Hamad was left on the bus for at least an hour before she was transported to One Police Plaza for booking.

114.    Other John Does and Jane Does marchers managed to help Ms. Hamad put her hijab back on so that she would no longer be uncovered in public.

115.    At One Police Plaza, male NYPD officers told Ms. Hamad to remove her hijab completely to take a photograph for booking. Ms. Hamad refused, explaining that it is against her religion to remove her hijab around men.

116.    One NYPD officer, a male Sergeant, then made a remark about Ms. Hamad's earrings, which had been removed during booking. He said, "Well, you're wearing earrings for male attention, so why not show us your hair too?"

117.    This comment humiliated Ms. Hamad as she relived the trauma of NYPD Officers' forcible removal of her religious head-covering. Ms. Hamad told the Sergeant that her earrings would never have been exposed had NYPD officers not removed her hijab in the first place.

118.    Ms. Hamad repeatedly reasserted that it is against her religion to remove her hijab in the presence of men. The Sergeant ultimately capitulated, allowing Ms. Hamad to take the photograph with her hijab on.

119.    Ms. Hamad requested to speak to an attorney while she was in police custody. Officers refused her request.

120.    Ms. Hamad learned that she had been charged with resisting arrest. Ms. Hamad was released from custody after about five hours; her criminal charges were ultimately dropped.

121.    Ms. Hamad missed several days from work because of this incident.

122.    Ms. Hamad visited an urgent care facility for a medical examination of her wrists. The examiner determined that she may have nerve damage in her wrists as a result of her arrest.

123.    Ms. Hamad feared for her life and well-being. She felt degraded and humiliated and continues to feel emotional distress as a result of this incident.

**Mario Fong**

124.    Mario Fong ("Fong") arrived at the peaceful march location around 12:00 pm.

125.    Around sunset, the crowd began to disperse.

126.    However, NYPD vehicles and personnel blocked off intersections and other exits. NYPD Officers lined up and slowly began marching in on the crowd, which now had nowhere to go.

127.    Mr. Fong was on the sidewalk when he heard NYPD announce over a megaphone: "get out of the street, or you will be arrested."

128.    Hearing this order, everyone who was in the street tried to get onto the sidewalk, which was already crowded. As this was happening the NYPD continued to advance forward, pressing the crowd onto the sidewalk and then towards the sides of buildings.

129.    In the crowd, Mr. Fong saw a teenage girl pushed to the ground by the advancing line of NYPD officers. Mr. Fong tried to help her up, but was unable to do so because of the lack of space.

130.    Finally, with the help of others in the crowd, Mr. Fong was able to help the girl to her feet. While this was happening, NYPD officers were yelling at Mr. Fong to move back. He told the officers that he can't move because there isn't space.

131.    Defendant Michael Butler ("Lt. Butler") reached beyond the officers in front of him, and violently placed Mr. Fong in a headlock, with such force that he was lifted several inches off the ground by his neck.

132.    While Mr. Fong was suspended midair, Lt. Butler began using his other arm to punch Mr. Fong in the head several times, causing his nose to bleed.

133.    Lt. Butler then dragged Mr. Fong backwards by his neck, until he was behind the

line of officers. Mr. Fong was suspended by his neck for several moments and was kicked by multiple officers several times, before finally being shoved to the ground.

134.   Lt. Butler violently placed his knee on Mr. Fong's back, pressing Mr. Fong's head into the pavement, causing lacerations on his neck and mouth. Mr. Fong's arms were pulled forcefully behind his back and his wrists were placed in zip ties.

135.   Mr. Fong was never read his Miranda rights, nor was he told what he was being charged with. Mr. Fong's arresting officer was detective Thomas Lane, Tax Reg. 942034.

136.   Mr. Fong feared for his life and well-being. He thought the Lt. Butler was about to kill him. This reminded Plaintiff of how George Floyd was brutally murdered.

137.   Mr. Fong later learned that he was charged with refusing to disperse.

138.   Mr. Fong was held at One Police Plaza for about five hours. During this period, Mr. Fong felt extremely lightheaded and fainted on at least one occasion.

139.   Mr. Fong requested medical attention from NYPD officers, but was refused.

140.   After Mr. Fong was released from police custody, he immediately went to Wyckoff Hospital in Brooklyn for a medical assessment, after which the doctor advised him to follow a concussion protocol.

141.   Mr. Fong missed about one week from work due to injuries and emotional distress he sustained during this incident.

142.   Mr. Fong continues to suffer from anxiety and emotional distress as a direct result of the incident.

**Amrou Ibrahim**

143.   Amrou Ibrahim ("Ibrahim") arrived at the march location at or around 12:00 pm, though the march was to begin around 2:00 pm.

18

144.   Mr. Ibrahim met with the organizers early, as he was one himself, in order to discuss plans for the march.

145.   Once the march started, the police controlled its flow and direction. Mr. Ibrahim recalls that the organizers intended on reaching the park at 67th street and 5th avenue and dispersing but that the NYPD stopped them from reaching the park.

146.   Upon stopping the march, the NYPD began funneling and blocking marchers into specific restrictive areas through the use of carefully placed officers, police vans, and prisoner buses.

147.   Like other participants at the march, officers from the NYPD kettled Mr. Ibrahim by cornering him and others and trapping their movement.

148.   Mr. Ibrahim felt trapped.

149.   Mr. Ibrahim was at the front of the march and thus was able to hear commands from officers.

150.   That upon hearing from officers to disperse, despite not yet reaching the park, Mr. Ibrahim directed marchers to disperse immediately.

151.   No sooner had Mr. Ibrahim directed marchers to disperse that he was handcuffed as he was trying to disperse amidst the kettling atmosphere the officers had created.

152.   The NYPD falsely arrested Mr. Ibrahim at or around 6:30 pm that day at the intersection of 67th street and 5th avenue in Brooklyn. Mr. Ibrahim's arresting officer was **SEJDI COBAJ**.

153.   Despite asking, Mr. Ibrahim was never told the reason for his detention and false arrest nor read his Miranda rights.

154.   After his arrest, Mr. Ibrahim was taken to the prisoner bus and searched.

155.    Mr. Ibrahim was handcuffed with very tight zip ties, causing severe pain to his wrist.

156.    Mr. Ibrahim is visibly presents as an Arab male.

157.    During the course of the arrest, officers called out to Mr. Ibrahim using Arabic terms like "ya'la," which means "let's go," instead of simply using the English command, "lets go."   Mr. Ibrahim felt humiliated and dehumanized. He suffered and stills suffers from psychological injury.

158.    After the NPYPD falsely arrested him, Mr. Ibrahim was transported with other arrestees to 1 Police Plaza where he was charged with failing to disperse after receiving a command to do so.

159.    Upon information and belief, though he was charged, the summons was never verified when Mr. Ibrahim appeared in court and, upon information and belief, the matter was dismissed for declining to prosecute.

160.    As a result of the NYPD illegal actions, Mr. Ibrahim suffered and is still suffering psychological injury including but not limited to isolation, withdrawal and PTSD.

161.    Mr. Ibrahim feared for his life and well-being during the events described herein.

**Ahmad Moussa**

162.    Ahmad Moussa arrived at the march around 3pm. Around sunset, Mr. Moussa heard the order of dispersal and began attempting to get on the sidewalk.

163.    Mr. Moussa saw NYPD Officers approaching the crowd and began recording on his cell phone for his safety.

164.    Mr. Moussa attempted to get on the sidewalk, but there was nowhere to go because the crowed was blocked on all sides by police officers.

165.    A NYPD Officer grabbed Mr. Moussa's wrist as he was attempting to comply with the dispersal order. Mr. Moussa told the officer that he was trying to get on the sidewalk, after which the officer released him.

166.    Shortly after, another NYPD officer came from behind him, picked Mr. Moussa up off the ground, and threw him face first to the ground. Mr. Moussa's phone fell and shattered into pieces.

167.    Mr. Moussa did not resist and put his hands behind his back to avoid escalation. The NYPD officer grabbed his wrist and pulled his arm. A barrage of officers descended on Mr. Moussa and began hitting him. Mr. Moussa bled from his left elbow and knee.

168.    NYPD Officers placed tight zip ties on Mr. Moussa. He requested that they be loosened, which they were two hours later.

169.    Mr. Moussa was never read his Miranda rights or told why he was being arrested. Mr. Moussa's arresting attorney was Elizabeth Medina, Tax Registry number 949316.

170.    At some point during the arrest, Mr. Moussa lost his keffiyeh, which he wears regularly. NYPD Officers ignored his requests about the whereabouts of his keffiyeh and whether they could return it. During the course of the arrest, NYPD officers called out to Mr. Moussa using Arabic terms like "ya'la," which means "let's go," instead of simply using the English command, "lets go."

171.    Mr. Moussa was taken on a bus to One Police Plaza and held for about 6 hours.

172.    Mr. Moussa was charged with failure to disperse. The charge was ultimately dismissed.

173.    The day after the march, Mr. Moussa went to urgent care because his wrist was injured and he could not move his thumb.

174.     Mr. Moussa also visited a hand specialist, who advised Mr. Moussa that he had permanent nerve damage and recommended wearing a brace and physical therapy.

175.     Mr. Moussa took days off school to deal with the mental and emotional trauma that he suffered.

176.     Mr. Moussa suffered physical, mental and emotional injury as a result of his arrest.

**Sazia Patel**

177.     Sazia Patel is one of the many people that helped organize the event.

178.     Ms. Patel is an observant Muslim woman who wears a hijab, which is a religious head covering, in accordance with her sincerely held beliefs. Ms. Patel believes that she may not remove her hijab nor uncover her hair around males she is not directly related to.

179.     Ms. Patel was working security on the day of the event and she was wearing a security badge.

180.     Ms. Patel arrived at the event location around 10:00 am for a planning session.

181.     Ms. Patel recalls the event beginning sometime after 12:00 pm.

182.     Ms. Patel spent much of the time between her arrival and the beginning of the march canvassing the area and handing out flyers.

183.     Once the march started, it came to a premature end around sunset when police gave the order to disperse onto the sidewalk and off Fifth Avenue.

184.      Ms. Patel immediately began directing people off the street.

185.     Almost immediately after the order was given and before anyone could comply, officers began attacking the peaceful marchers not giving them the opportunity to comply.

186.     Ms. Patel and others in the crowd were shouting, in sum and substance, that they were complying with the officers' orders.

187.    NYPD Officers had forced Ms. Patel and other marchers into specific restricted areas in a kettling fashion, making it impossible for marchers to comply with officers' command to disperse.

188.    Ms. Patel tried to disperse the crowd off the street and to the park but was prevented from doing so because officers blocked the marchers with officers and vans.

189.    NYPD Officers violently grabbed and tossed Ms. Patel to the ground.

190.    At least one officer grabbed Ms. Patel and placed his knee on her neck and back to restrain her, causing bruising and severe pain to Ms. Patel's back and neck.

191.    Officers forcibly and violently removed her Palestinian scarf (keffiyeh) which she wore as her religious head-covering called the hijab. Despite Ms. Patel screaming at the arresting officer to have a female officer and cover her head with the hijab, officers ignored her.

192.    Ms. Patel's arresting NYPD officer fastened her cuffs tightly, causing lacerations on her wrists.

193.    Ms. Patel suffered bruises on her wrist along with cuts to her hand and neck.

194.    Now handcuffed, the NYPD Officers attempted to take a photo of Ms. Patel without her hijab before placing her in the prisoner bus. Ms. Patel refused to allow her photo to be taken without her hijab.

195.    The NYPD officers in a mocking fashion put the garment on top of her head, took the picture and the hijab immediately fell off after they took the picture. The NYPD Officers exposed Ms. Patel, to degradation, humiliation and discrimination. The purpose of wearing her hijab was that no men should see her hair, according to her religious belief. The NYPD officers knew Ms. Patel's religious belief and duty were sacred but violated them with impunity.

196.    Her arresting NYPD officer and those that checked and detained her were all male.

197.    Ms. Patel and other marchers were transported to 1 Police Plaza where she was searched and detained.

198.    At 1 Police Plaza, officers took Ms. Patel's booking photo with her hijab partially on her head.

199.    After Ms. Patel's photographs were taken, officers humiliated her once again by removing her hijab. Only after Ms. Patel protested that they were violating her freedom of religion did the officers return her headscarf.

200.    The NYPD Officers laughed at Ms. Patel and other marchers throughout the process, including laughing at the pictures officers took of Ms. Patel and other marchers.

201.    Upon responding to a notice to appear in court in November 2023, Ms. Patel learned that the charges against her were never processed and as the prosecutor declined to prosecute.

202.    Ms. Patel has been traumatized by this false arrest, detention, removing of her religious garb causing her to abandon her work.

203.    Ms. Patel no longer takes the subway or attend events that involve large police presence.

204.    During the arrest Ms. Patel feared for her life and well-being. She believed the police officer was going to kill her. This reminded Ms. Patel of how George Floyd was brutally murdered.

205.    Ms. Patel felt degraded and humiliated, and continues to feel emotional distress as a result of this incident.

**Ahmed Boukendakdji**

206.    Ahmed Boukendakdji arrived at the march in mid-afternoon with some family members and friends, including his mother and his three-year-old niece.

207.    Around sunset, Mr. Boukendakdji attempted to comply with police orders for protesters to get off the asphalt and onto the sidewalk. However, because there were so many people in front of Mr. Boukendakdji, there was nowhere to go. The NYPD knew that it would be impossible for marchers to move in such a short period of time.

208.    The NYPD Officers continued to push Mr. Boukendakdji by poking something in his back. He felt as though he was fighting for his life to avoid getting trampled on.

209.    While Mr. Boukendakdji was documenting this, an NYPD Officer brutally grabbed his hand and threw him to the ground and at least four officers piled on top of him and put their knees on his neck, effectively choking him. At that moment Mr. Boukendakdji feared for his life.

210.    The NYPD Officers then put zip ties on him tightly and let him back into the crowd. Mr. Boukendakdji's arresting officer was Douglas Schack* Tax Registry number 931175. Mr. Boukendakdji was never read his Miranda rights.

211.    Shortly after, a different NYPD Officer approached Mr. Boukendakdji, arrested him and took him to the police bus for transport to One Police Plaza.

212.    At some point during the arrest, the NYPD Officers removed Mr. Boukendakdji's keffiyeh – a symbol of his national origin, race and religious significance. It was not returned to him until he was released.

213.    Once at the plaza, it took approximately three NYPD Officers to remove Mr. Boukendakdji's zip-ties because they were so tight.

214.    Mr. Boukendakdji was in great pain and sustained scratches and bruising on his wrists from the zip-ties, as well as injury to his shoulder.

215.    Mr. Boukendakdji suffered and he is suffering emotional and psychological distress.

**Sandy Garcia**

216.    Sandy Garcia arrived at the event in the evening with her friend.

217.    About an hour after Ms. Garcia arrived at the peaceful march, the situation escalated when NYPD Officers began yelling orders for marchers to disperse.

218.    Ms. Garcia moved onto the sidewalk after hearing orders to do so. However, after seeing police officers on the sidewalk, Ms. Garcia feared they would harm her by using tear gas or another crowd control mechanism, and so she moved back to the street where she thought it was safer.

219.    Ms. Garcia had this fear of the police harming her based on other NYPD police actions she had seen where officers direct people to a direction only to then hurt them.

220.    An NYPD officer approached Ms. Garcia while she was standing on the street, his hands touched her breasts, and he yelled at her to get off the road. Ms. Garcia froze in panic because of the way the officer was touching her.

221.    Multiple NYPD Officers then pushed Ms. Garcia toward a bus and brutally zip tied her and hurt her entire right side in the process. More NYPD Officers arrived and surrounded Ms. Garcia, who remained frozen. She feared for her life and well-being.

222.    Multiple officers then picked up Ms. Garcia. One officer then grabbed her butt with force while staring Ms. Garcia in the eye. The NYPD Officers proceeded to carry her onto the bus.

223.    The NYPD Officers falsely arrested and detained Ms. Garcia. They did not read any of her Miranda rights.

224.    While Ms. Garcia was on the bus, another protester was crying out in pain, so Ms. Garcia attempted to call out to the officers to get medical attention for her. The officers refused.

225.    Ms. Garcia was then taken to the precinct, booked, and released.

226.    Ms. Garcia sustained multiple physical injuries because of this arrest, including but not limited to an injured shoulder, back, and hip. Ms. Garcia continues to suffer pain from these injuries.

227.    Ms. Garcia was diagnosed with post-traumatic stress disorder (PTSD), anxiety, and depression. As a result of this incident, Ms. Garcia sought extensive care from multiple mental health professionals and continues to suffer physical and emotional pain as a result of her experience.

**Cedar Sklar-Luers**

228.    Cedar Sklar-Luers ("Sklar-Luers")[11] arrived at the rally location at or around 2:00 pm.

229.    At around sunset, Sklar-Luers first heard the NYPD orders to disperse from the rally location.

230.    At the same time, Sklar-Luers observed NYPD officers start to form a human barrier to prevent anyone from exiting the rally location, trapping hundreds of rally participants and making it extremely difficult to comply with the order to disperse.

231.    As this was happening, Sklar-Luers noticed a rally participant, a young under age teenager, being chased down by a group of about five NYPD officers, around the corner from the main crowd.

232.    Concerned for the child's safety, Sklar-Luers chased after the NYPD officers, to act as a witness in case the child was harmed.

233.    About 10 minutes later, Sklar-Luers had rounded the corner, and was able to catch up to within fifty feet of the group of NYPD officers.

---

[11] Sklar-Leurs henceforth will be referred to with the pronouns "they" or "their."

234.   Sklar-Luers noticed that the child whom the NYPD Officers had been chasing had successfully evaded them, and had fled into the distance.

235.   Having failed to apprehend their original target, the NYPD officers appeared visibly frustrated, and suddenly turned their attention towards Sklar-Luers, who was now the nearest marcher participant.

236.   The NYPD officers rushed at Sklar-Luers, brutally threw Sklar-Luers to the sidewalk, and placed handcuffs on them, causing lacerations to their wrists, arms and knees.

237.   Having tackled Sklar-Luers, the NYPD officer placed his knee on Sklar-Luers' back with such force that an umbrella in Sklar-Luers' backpack broke in half, causing a loud snapping sound, and reinjuring a chronic back injury. In that moment, Sklar-Luers feared for their life.

238.   The NYPD officer placed zip ties on Sklar-Luers' hands, and then lifted Sklar-Luers up against a chain link fence, pressing their face firmly against the fence for around twenty minutes, causing additional injuries.

239.   Sklar-Luers demanded to know what crime they were being charged with. One of the arresting NYPD officers responded, "making an obscene gesture." Sklar-Luers was never read their Miranda rights.

240.   Sklar-Luers was placed in an NYPD van, where they were left alone for about 30 minutes, and later moved to a larger NYPD bus for transport to One Police Plaza.

241.   Sklar-Luers learned during the booking process that they had been charged with failure to disperse; the charge was later withdrawn.

242.   As a result of this NYPD contact, Sklar-Luers suffered and still suffering from anxiety, post-traumatic stress disorder ("PTSD"), depression and they continue to suffer emotional

pain as a result of their experience.

243.    Because of the incident, Sklar-Luers was forced to take substantial medical leave from their undergraduate program at New York University, and was prevented from graduating with *cum laude* honors.

### III.    NYPD's October 21 Operation Is Consistent With Its History of Violent Attacks Against Peaceful Marchers

244.    The NYPD's October 21, 2023 operation against the peaceful marchers as described above ("October 21 Operation") is in line with a long list of similar operations the NYPD has conducted under this current and prior Mayors.

245.    What followed from the murder of George Floyd in Minneapolis, Minnesota, were hundreds of peaceful marches across the United States America.

246.    None were more marked by NYPD's kettling and violence than the event of June 4, 2020 in the South Bronx neighborhood of Mount Haven where peaceful marchers were methodically corralled only to be violently attacked and arrested.

247.    The Mount Haven peaceful marchers filed a civil action in the Southern District of New York titled *Sierra v. City of New York*, 20-cv-10291.

248.    In *Sierra*, the Plaintiffs alleged that as peaceful marchers yelled "Let us go, let us go,"

> The NYPD did not permit peaceful marchers to leave the kettle. The phalanx of officers pressed in, pushing the protesters tightly together. Police officers with batons and shields struck people at the edge of the encircled group, thrust raised bicycles into trapped protesters, and indiscriminately sprayed them with pepper spray. In some instances, officers pulled down face masks and pulled up face shields to pepper spray protesters directly in the face. The protesters had committed no acts of violence or resistance that would justify this excessive and unreasonable use of force. Many protesters were left injured and bleeding. Some protesters fainted, or lost consciousness and went into convulsions.

*Sierra* Complaint at ¶¶53-60.

249.     *Sierra*, which had not been resolved at the time of the October 21, 2023 operation, has since been resolved in a settlement that remains *sub judice*.

250.     Mayor Adams was swift in voicing his disapproval and contempt with the settlement he initially agreed to, saying:

> The Police Department … [has] to be extremely more hesitant in actions that they would have carried out in the past to keep the peace," Hizzoner warned during a Tuesday press conference
>
> "I did not agree with the concept of those changes," he continued. "I pushed back hard … I thought it put us on a very troubling direction."

*Mayor Adams sounds alarm on NYPD BLM settlement as ant-Israel protests rage: 'Very troubling,"* NY Post, December 26, 2023.

251.     On June 3, 2020, the NYPD had carried out a similar operation in Brooklyn: NYPD officers surrounded non-violent protesters who were critical of the NYPD and its history of racially biased policing; and as they later did in Mott Haven, NYPD officers violently arrested protesters in retaliation for their exercise of free speech.

252.     The circumstances of the NYPD's June 3 operation in Brooklyn are described in detail in another federal lawsuit filed on July 15, 2020.  In *Gelbard* et al. *v. City of New York* et al., No. 20 Civ. 3163 (E.D.N.Y.), filed July 15, 2020, Plaintiffs described a similar June 3, 2020 operation where they asserted that the NYPD's violent actions are "[not] unique" and are intended "to assert dominance, discourage further protests, and punish expression that the police perceive to be hostile and threatening to their interests."   *Gelbard* Complaint ¶¶ 5, 12.

253.     In As summarized in the *Gelbard* Complaint:

> The NYPD's brutality toward Plaintiffs is neither accidental nor unique. It is a product of the NYPD's deliberate plan to surround peaceful protesters, charge them with batons, and violently assault them. . . . While the violence inflicted by the NYPD has no justification, it has a clear purpose: to assert police dominance, discourage further protests, and

punish expression that the police perceive to be hostile and threatening to
their interests.

*Gelbard* Complaint ¶¶ 5, 12.

254.    In yet another case filed in 2020, *Payne* et al. *v. de Blasio* et al. No. 20-cv-08924
(S.D.N.Y.), Plaintiffs describe a similar incident to the event and describe it as "police violence"
[] "condoned and even promoted" by the Mayor and NYPD leadership as "retaliation for the
peaceful marchers message." *Payne* Complaint ¶¶ 1, 3, 35-60.

255.    *Payne*, *People of the State of New York v. City of New York et al.*, No. 21-cv-322;
*Gray et al v. City of New York*, *et al.*, 21-cv-6610; and *Rolon et al. v. City of New York, et al.*, 21-
cv-2548 were later consolidated as *In Re: New York City Policing During Summer 2020
Demonstrations*.

## **FEDERAL CLAIMS**

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 FIRST AMENDMENT CLAIMS BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

256.    Plaintiffs reallege and incorporate by reference the allegations set forth in the
foregoing paragraphs as if fully set forth herein.

257.    At all times herein, all Plaintiffs were engaged in their rights to free speech and
assembly as protected by the First Amendment of the Constitution.

258.    In committing the acts and omissions complained of herein, the defendants acted
under color of state law, individually and in concert, to deprive Plaintiffs of the rights protected
by the First Amendment to the United States Constitution by directing the Plaintiffs to be targeted
for law enforcement action in retaliation for their free speech.

259.    At all times herein, the individual Plaintiffs were seized, restrained or arrested
without the requisite individualized probable cause for their arrest, detention or restraint.

260.     As a result of the foregoing, Plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

261.     The unlawful conduct of the City, the City Officials, and the individual officers was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983, PLAINTIFF HAMAD'S FIRST AMENDMENT CLAIM AGAINST ALL DEFENDANTS

262.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

263.     At all times herein, Plaintiff Ms. Hamad was engaged in her rights to freedom of religion as protected by the First Amendment of the Constitution.

264.     At all times herein, the First Amendment protects Ms. Hamad's rights to wear the hijab, the headscarf for women of the Muslim faith, in all public settings.

265.     In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, to deprive Plaintiff Ms. Hamad of the rights protected by the First Amendment to the United States Constitution by violating her sincerely held religious beliefs.

266.     At all times herein, Ms. Hamad was seized, restrained or arrested without the requisite individualized probable cause for her arrest, detention or restraint.

267.     As a result of the foregoing, Ms. Hamad was deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged

and injured.

268.    The unlawful conduct of the City, the City Officials, and the individual officers was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CAUSE OF ACTION
## 42 U.S.C. § 1983, PLAINTIFF PATEL'S FIRST AMENDMENT CLAIM AGAINST ALL DEFENDANTS

269.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

270.    At all times herein, Plaintiff Ms. Patel was engaged in her rights to freedom of religion as protected by the First Amendment of the Constitution.

271.    At all times herein, the First Amendment protects Ms. Patel's rights to wear the hijab, the headscarf for women of the Muslim faith, in all public settings.

272.    In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, to deprive Plaintiff Ms. Patel of the rights protected by the First Amendment to the United States Constitution by violating her sincerely held religious beliefs.

273.    At all times herein, Ms. Patel was seized, restrained or arrested without the requisite individualized probable cause for her arrest, detention or restraint.

274.    As a result of the foregoing, Patel was deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

275.    The unlawful conduct of the City, the City Officials, and the individual officers

was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983, (FOURTH AMENDMENT – EXCESSIVE FORCE) BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

276. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

277. Defendants unlawfully assaulted the Plaintiffs without justification to do so.

278. In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, to deprive plaintiffs of the rights protected by the Fourth Amendment to the United States Constitution.

279. At all times herein, the individual Plaintiffs were seized, restrained or arrested without the requisite individualized probable cause for their arrest, detention or restraint.

280. As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

281. Defendants' actions resulted in the use of excessive force to effectuate an otherwise unlawful arrest.

282. Defendants did use excessive force against Plaintiffs by, inter alia, hitting them, placing them in a chokehold, excessively tightening their restraints, removing their hijab, using their knees to the neck of Plaintiffs, punching them to the head, and sexually assaulting them.

283. The unlawful conduct of the City, the City Officials, and the individual officers was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CAUSE OF ACTION
## 42 U.S.C. § 1983 (FOURTH AMENDMENT – KETTLING) BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

284.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

285.    In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, to deprive plaintiffs of the rights protected by the Fourth Amendment to the United States Constitution.

286.    At all times herein, the individual Plaintiffs were seized, restrained or arrested without the requisite individualized probable cause for their arrest, detention or restraint.

287.    As a result of the foregoing, plaintiffs were deprived of liberty as they were not free to leave, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

288.    That in addition, the actions of the Defendants resulted in the use of kettling to effectuate an otherwise unlawful arrest.

289.    The unlawful conduct of the City, the City Officials, and the individual officers was willful, malicious, oppressive, and/or reckless, as well as part of pattern and practice of the City of New York.  The NYPD actions, the city officials and the NYPD actions were intentional. Such actions require punitive damages.

## SIXTH CAUSE OF ACTION
## 42 U.S.C. § 1983 (FOURTEENTH AMENDMENT) BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

290.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

291.    In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, and deprived plaintiffs of the rights and liberties protected by the Fourteenth Amendment to the United States Constitution by treating Plaintiffs differently than the pro-Israeli peaceful marchers. They deprived them of Constitutional protections such as those afforded the pro-Israeli peaceful marchers. Defendants' actions resulted in severe damages to Plaintiffs.

292.    At all times herein, the individual Plaintiffs were seized, restrained not free to leave and/or arrested without the requisite individualized probable cause for their arrest, detention or restraint.

293.    As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

294.    The unlawful conduct of the City, the City Officials, and the individual officers was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SEVENTH CAUSE OF ACTION
### MONEL CLAIM

295.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

296.    In addition to the acts described above being part of an official policy or unofficial customs, these acts were motivated and part of NYPD's policy, since at least 2002, of "sending officers to Israel for trainings and sharing surveillance information with Israeli agencies, both directly and through trips facilitated by non-governmental organizations" to learn tactics used to

occupy Palestinians.

297.    This policy of adopting Israel IDF's broken window blueprint promotes discriminatory policing and detention that includes the since prohibited Stop and Frisk policing later adopted by Israel's IDF.

298.    The actions of Defendants heretofore described resulting from the October 21, 2023 arrest, detention, imprisonment, assault, use of excessive force, of the Plaintiffs, constitute an unlawful arrest, imprisonment, assault, and use of excessive force, which deprived the Plaintiffs of rights, privileges, and immunities as guaranteed under the United States Constitution, Amendments One, Four, Five, and Fourteen, the New York State Constitution, the Civil Rights Acts, 42 U.S.C. §§ 1981, 1983, 1985,1986, and 1988 and the complained of conduct was either the result of an official policy or unofficial custom, including but not limited to, policies and customs concerning the detention of New Yorkers, similar of Plaintiffs' ethnic, religious race and national origin  background as well as those exercising their free speech, without probable cause, the use of excessive and unreasonable force, the fabrication of criminal complaints, the arrest and detention of individuals known to have not committed any criminal wrong doing and the hiring, training, supervision, retention and discipline of the defendant CITY's and NYPD's agents, servants and/or employees, and those involving the arrest, detention and prosecution of individuals, including and especially, those persons who are of the Plaintiffs' ethnic descent.

299.    That these unlawful customs and policies have been or are being adjudicated as described above and the City is fully aware of these unlawful customs and policies and has not abated.

300.    That the Defendants established a custom policy and/or practice of encouraging, approving and/or tolerating the use by the NYPD of excessive force and acts of misconduct against

civilians, and especially those civilians who are of the Plaintiffs' ethnic descent and/or exercising their rights to free speech and subsequent attempts to conceal such actions by failing to adequately train, supervise, and discipline its agents, employees and offices.

301.    That the Defendants were deliberately indifferent to the use of improper procedures in the detention and arrest of civilians, and especially those civilians who are of the Plaintiffs' ethnic descent and/or exercising their freedom of speech, and established a custom policy and/or practice of encouraging, approving and/or tolerating the use of said improper procedures by the NYPD, including but not limited to the stopping, frisking, detention and arrest of persons without probable cause, the use of excessive force, kettling, the fabrication of criminal complaints and evidence, the withholding of exculpatory evidence and subsequent attempts to conceal such actions by failing to adequately train, supervise, and discipline its agents, employees and offices.

302.    The policy and/or unofficial custom is most exemplified in the recent cases, *In Gelbard* et al. *v. City of New York* et al., No. 20 Civ. 3163 (E.D.N.Y.), filed July 15, 2020, *In Re: New York City Policing During Summer 2020 Demonstrations,* and *Sierra v. City of New York*, 20-cv-10291.

303.    The Defendants' actions were undertaken under color of law and would not have existed but for said Defendants' use of their official power.

304.    That the Defendants conspired with each other and acted in concert to discriminate against and deprive the Plaintiffs of their constitutional and civil rights.

305.    The supervisors and policy making officers of Defendants CITY and NYPD, as a matter of policy, are deliberately indifferent to said practices and have failed to take steps to terminate the herein above detailed practices and have failed to discipline or otherwise properly supervise the individuals engaged in such practices.

306.    The Defendants CITY and City Officials have failed to properly or effectively train its agents, servants and/or employees, with regard to proper constitutional and statutory limits on the exercise of their authority, and such failure continues to this day.

307.    The Defendants CITY and City Officials have sanctioned the policy and practices heretofore described through its deliberate indifference to the effect of such policy and practices upon the constitutional rights of the Plaintiffs and others similarly situated.

308.    That the Defendants' motivations were in contravention of the United States Constitution and the Constitution of the State of New York.

309.    By reason of the foregoing, the Plaintiffs have been damaged and suffered serious and severe permanent physical injuries and emotional harm as a result of these deprivations of constitutional and civil rights.

310.    The Defendants' conduct was willful, wanton, reckless, malicious and/or exhibited a gross indifference to, and a callous disregard for human life, safety and the rights of others, and more particularly, the rights, life and safety of the Plaintiffs; and was motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement and/or cost avoidance, to the virtual exclusion of all other considerations, all to Plaintiffs' damage, in an amount to be determined at trial plus punitive damages and attorney's fees.

**STATE CLAIMS**

**EIGHTH CAUSE OF ACTION**
**FALSE ARREST AND FALSE IMPRISONMENT BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

311.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

312.    On or about October 21, 2023, Plaintiffs were intentionally detained by the Defendants.

313.    At all times herein, the individual Plaintiffs were seized, restrained or arrested without the requisite individualized probable cause for their arrest, detention or restraint.

314.    Following their arrest, all Plaintiffs were arrested and detained, not free to leave and subsequently transported to 1PP.

315.    In detaining the Plaintiffs, the Defendants were acting under color of state law and within the scope of their employment by the CITY and NYPD.

316.    Plaintiffs were aware of their detention.

317.    Plaintiffs did not consent to being detained.

318.    Plaintiffs' detention was not privileged as Defendants did not even execute an accusatory instrument.

319.    Plaintiffs' detention was not privileged as Defendants lacked probable cause for their detention.

320.    As a result of their illegal detention, the Plaintiffs' Fourth and Fourteenth Amendment rights were violated.

321.    The aforesaid false arrest and imprisonment caused Plaintiffs to suffer severe physical injuries, emotional and psychological distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to their reputation, all to Plaintiffs' damage, in an amount to be determined at trial plus punitive damages and attorney's fees.

## NINTH CAUSE OF ACTION
**ASSAULT AND BATTERY BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

322.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

323.    At all times herein, the individual Plaintiffs were seized, restrained or arrested without the requisite individualized probable cause for their arrest, detention or restraint.

324.    The acts of Defendant Officers along with those acts of the other police officers, and Defendants JOHN DOE POLICE OFFICERS 1-10, whose identities are presently unknown to the Plaintiffs who assisted in the arrest of the Plaintiffs, caused the Plaintiffs to apprehend and/or fear unfriendly contact.

325.    Reasonable persons in the same circumstances as the Plaintiffs, would have apprehended and/or feared unfriendly contact.

326.    Defendant Officers and the other police officers, and Defendants JOHN DOE POLICE OFFICERS 1-10, whose identities are presently unknown to the Plaintiffs who assisted in the arrest of the Plaintiffs, brutally assaulted battered Plaintiffs causing them serious physical and emotional harm. Plaintiffs feared for their lives as they were brutally assaulted and suffered physical harm. Plaintiffs continue to suffer from their physical and emotional injuries.

327.    Defendants Officers and JOHN DOE POLICE OFFICERS 1-_ were in the employ of the defendants City, when Plaintiffs were assaulted.

328.    The assault, as aforesaid, was within the scope of the employment of Defendants Officers and JOHN DOE POLICE OFFICERS 1-10.

329.    The Defendants assaulted the Plaintiffs.

330.    The acts of Defendant Officers, along with those acts of the other police officers, and Defendants JOHN DOE POLICE OFFICERS 1-10, whose identities are presently unknown to the Plaintiffs who assisted in the arrest of the Plaintiffs, were intended to make harmful contact with the Plaintiffs.

331. Defendant Officers and the other police officers, and Defendants JOHN DOE POLICE OFFICERS 1-10, whose identities are presently unknown to the Plaintiffs who assisted in the arrest of the Plaintiffs, made harmful contact with the Plaintiffs.

332. Defendant Officers and the other police officers, and Defendants JOHN DOE POLICE OFFICERS 1-10, whose identities are presently unknown to the Plaintiffs who assisted in the arrest of the Plaintiffs, battered Plaintiffs.

333. At all times herein mentioned, the Defendant Officers and the other police officers, and Defendants JOHN DOE POLICE OFFICERS 1-_, whose identities are presently unknown to the Plaintiffs who assisted in the arrest of the Plaintiffs, negligently, carelessly and recklessly came into harmful contact with the person of the Plaintiff.

334. That the Defendants' assault and battery of the Plaintiffs constitute the use of excessive force in violation of the Plaintiffs' civil rights.

335. The Plaintiffs were thereby caused to be injured on or about October 21, 2023.

336. As a result, Plaintiffs were injured, internally and externally, became sick, sore, lame and disabled, and was caused to suffer and still suffers severe and permanent injuries and will continue to suffer pain and discomfort; and were caused to obtain continued medical care in an attempt to treat the aforesaid injuries.

337. The Defendants' conduct was willful, wanton, reckless, malicious and/or exhibited a gross indifference to, and a callous disregard for human life, safety and the rights of others, and more particularly, the rights, life and safety of the Plaintiffs; and was motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement and/or cost avoidance, to the virtual exclusion of all other considerations, racial/ethnic animus and religious animus, all to

Plaintiffs' damage, in an amount to be determined at trial plus punitive damages and attorney's fees.

## TENTH CAUSE OF ACTION
## FAILURE TO INTERVENE BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

338.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

339.    Defendants had an affirmative duty to intervene on behalf of plaintiffs, whose constitutional rights were being violated in their presence by other officers.

340.    Defendants failed to intervene to prevent the unlawful conduct described herein.

341.    The unlawful conduct described above is well known to all Defendants as being unlawful at all times described above during the event.

342.    As a result of the foregoing, plaintiffs' liberty was restricted for an extended period of time, he was put in fear of his safety, and he was humiliated and subject to other physical constraints.

343.    Defendants were at all times agents, servants, and employees acting with the scope of their employment by the CITY, which are therefore responsible for their conduct.

344.    The CITY, as the employer of the officer defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

345.    The Defendants' conduct was willful, wanton, reckless, malicious and/or exhibited a gross indifference to, and a callous disregard for human life, safety and the rights of others, and more particularly, the rights, life and safety of the Plaintiffs; and was motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement and/or cost avoidance, to the virtual exclusion of all other considerations, racial/ethnic animus and religious animus, all to

Plaintiffs' damage, in an amount to be determined at trial plus punitive damages and attorney's fees.

## ELEVENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

346.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

347.    At all times herein, the individual Plaintiffs were seized, restrained or arrested without the requisite individualized probable cause for their arrest, detention or restraint.

348.    The aforementioned actions of Defendants were outrageous, malicious, shocking and exceeded all reasonable bounds of decency tolerated by the public community.

349.    Defendants acted with the intent to cause Plaintiffs emotional distress and/or acted under circumstances known to them which made it substantially certain that they would cause such emotional distress.

350.    Defendants acted with utter disregard of the consequences of their actions. As a result, Plaintiffs were caused to suffer the intentional infliction of emotional distress.

351.    The aforesaid intentional infliction of emotional distress caused Plaintiffs to suffer severe physical injuries, emotional and psychological distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to their reputation, all to Plaintiffs' damage, in an amount to be determined at trial plus punitive damages and attorney's fees.

## TWELFTH CAUSE OF ACTION
## NEGLIGENT HIRING, TRAINING and SUPERVISION BY ALL PLAINTIFFS AGAINST THE CITY OF NEW YORK

352.    Plaintiffs reallege and incorporate by reference the allegations set forth in the

foregoing paragraphs as if fully set forth herein.

353.    Defendants CITY and NYPD were negligent in its hiring of its agents, servants and/or employees, especially including Defendants Officers and JOHN DOE POLICE OFFICERS 1-10, who Defendants CITY and NYPD knew, or in the course of adequate and proper investigation should have reasonably known, were unfit to hold their positions.

354.    The actions of Defendants CITY and NYPD, through their agents, servants and/or employees, including Defendants Officers and JOHN DOE POLICE OFFICERS 1-10, heretofore described constitutes negligence in that Defendants CITY and NYPD negligently trained or failed to train its agents, servants, or employees, especially including Defendants Officers and JOHN DOE POLICE OFFICERS 1-10.

355.    The actions of Defendants CITY and NYPD, through their agents, servants and/or employees, including Defendants Officers and JOHN DOE POLICE OFFICERS 1-10, heretofore described constitutes negligence in that Defendants CITY and NYPD negligently supervise or failed to supervise its agents, servants, or employees, especially including Defendants Officers and JOHN DOE POLICE OFFICERS 1-10.

356.    The actions of Defendants CITY and NYPD, through their agents, servants and/or employees, including Defendants Officers and JOHN DOE POLICE OFFICERS 1-10, heretofore described constitutes negligence in that Defendants CITY and NYPD negligently failed to discipline or failed to discipline its agents, servants, or employees, especially including Defendants Officers and JOHN DOE POLICE OFFICERS 1-10.

357.    Defendants CITY and NYPD was negligent in its retention of its agents, servants and/or employees, especially including Defendants Officers and JOHN DOE POLICE OFFICERS 1-10, who Defendants CITY and NYPD knew, or in the course of adequate and proper

investigation should have reasonably known, were unfit to hold their positions in that they refused or failed to perform within the statutory and constitutional limits of their authority and misused and abused their positions.

358.    That the defendants, their agents, servants, and/or employees were otherwise, and in general, careless, reckless and negligent under the circumstances existing as previously described.

359.    All of the causes of action of their complaint are specifically excepted under C.P.L.R. § 1602.

360.    As a result of the negligence of Defendants CITY and NYPD and the acts of Defendants Officers and JOHN DOE POLICE OFFICERS 1-10 and other agents, servants and/or employees of Defendants CITY and NYPD, without any negligence on the part of Plaintiff, Plaintiff was caused to suffer severe and permanent personal injuries, pain and suffering, emotional and psychological distress, anguish, anxiety, fear, humiliation, loss of freedom, and loss of wages, legal expenses, and damage to his reputation, all to Plaintiffs' damage, in an amount to be determined at trial plus punitive damages and attorney's fees.


### THIRTEENTH CAUSE OF ACTION
### NEGLIGENCE BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

361.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

362.    Defendants Officers and JOHN DOE POLICE OFFICERS 1-10, while acting as an agent, servant and employee of Defendants City and NYPD, individually and in their capacity as police officers for Defendant NYPD, owed a duty to members of the public, including Plaintiffs herein, to perform their police duties without excess force, to stop, arrest and imprison members

of the public, including Plaintiffs herein, with probable cause and/or reasonable suspicion that a crime had been committed, to arrest and imprison suspects, including Plaintiffs herein, in a reasonable manner, to enforce laws and regulations in a reasonable manner, and to exercise reasonable care in the performance of their duties as a police officer of the NYPD.

363.    That the aforementioned occurrences on October 21, 2023 took place by reason of the negligence of Defendants, their agents, servants, employees, police officers and Defendants Officers and JOHN DOE POLICE OFFICERS 1-10, individually, and acting within the course and scope of their employment with Defendant NYPD, and under the authority of Defendants, City and the NYPD.

364.    That as a direct, sole and proximate cause of the negligence, assault and battery, excessive use of force, false arrest and false imprisonment and violation of plaintiffs' civil rights, Plaintiffs were caused to and did sustain pain and suffering, humiliation, embarrassment, emotional and mental distress and anguish, moral and mental degradation, indignity and disgrace, injury to personal and business reputation, inconvenience, disturbance and disruption of life and loss of personal and business income, all to Plaintiffs' damage, in an amount to be determined at trial plus punitive damages and attorney's fees.

### FOURTEENTH CAUSE OF ACTION
### VIOLATION OF NEW YORK STATE CONSTITUTION BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

365.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

366.    By virtue of the heretofore described conduct, including, *inter alia*, the arrest, Defendants, acting under color of law, violated Plaintiffs' rights vested under Articles Five, Six, and Twelve of the New York State Constitution.

367.    A damages remedy is necessary and appropriate to effectuate the purposes of Articles Five, Six, and Twelve of the New York State Constitution, as well as to ensure a full realization of Plaintiffs' civil and constitutional rights thereunder.

368.    The aforesaid violation of New York State Constitutional rights caused Plaintiffs to suffer severe physical injuries, emotional and psychological distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to their reputation, all to Plaintiffs' damage, in an amount to be determined at trial plus punitive damages and attorney's fees.

## FIFTEENTH CAUSE OF ACTION
### ARTICLE. 1 § 12 OF THE NEW YORK STATE CONSTITUTION (EXCESSIVE FORCE) BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

369.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

370.    The degree of force used by Defendants in effecting the arrest of Plaintiffs was excessive, unreasonable and unwarranted.

371.    Defendants' actions were intentional, willful, malicious, egregious, grossly reckless and negligent, unconscionable and unprovoked.

372.    As a result of the excessive force and brutality, Plaintiffs sustained significant injuries requiring medical treatment.

373.    All of the aforementioned acts of Defendants constituted excessive force under the laws of the State of New York and they are liable for said damage.

374.    The aforesaid excessive force caused Plaintiffs to suffer severe physical injuries, emotional and psychological distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of

wages, legal expenses and damage to their reputation, all to Plaintiffs' damage, in an amount to be determined at trial plus punitive damages and attorney's fees.

## SIXTEENTH CAUSE OF ACTION
## ARTICLE 1, § 11 OF THE NEW YORK CONSTITUTION BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

375.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

376.    Article I, § 11 of the New York Constitution provides that, "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."

377.    By reason of the foregoing paragraphs, by discriminating against Plaintiffs, Defendants deprived them of rights, remedies, privileges, and immunities guaranteed to every person, including, but not limited to the right guaranteed by Article I, § 11 of the New York Constitution to the equal protection of the laws.

378.    The Defendants acted under pretense and color of state law and within the scope of their employment with the City of New York and the NYPD.

379.    Defendant CITY, through NYPD and its agents, and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern, practice, or custom by NYPD staff of discriminating against Plaintiffs for their race and national origin, and the content of the exercise of their right to free speech.

380.    By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

381.    Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand compensatory and punitive damages as follows:

1.  On the First Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

2.  On the Second Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

3.  On the Third Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

4.  On the Fourth Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

5.  On the Fifth Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

6.  On the Seventh Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

7.  On the Eighth Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

8.  On the Ninth Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

9.  On the Tenth Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

10. On the Eleventh Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

11. On the Twelfth Cause of Action from these Defendants jointly and severally on all

causes of action, in an amount to be determined at trial.

12. On the Thirteenth Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

13. On the Fourteenth Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

14. On the Fifteenth Cause of Action from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial.

15. On the Sixteenth from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial;

16. For declaratory relief as to the unconstitutional nature of the NYPD conduct described herein, and

17. Plus attorneys' fees, any available statutory remedies, both legal and equitable, and interests and costs, and requests that the court enter:

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues in this action that are so triable pursuant to 42 U.S.C. § 1981 and Title VII, civil Rights Act of 1991.

Dated: New York, NY
      June 10, 2025

_____
Omar T. Mohammedi, Esq.
Mustapha Ndanusa, Esq.
Law Firm of Omar T. Mohammedi, LLC
233 Broadway, Suite 820
The Woolworth Building
New York, NY 10279
(212) 725-3846
**Lead Counsel**


*/s/Lamya Agarwala*_____
Lamya Agarwala, Esq.
Council on American Islamic Relations, New York (CAIR-NY)
80 Broad Street, 5th Floor
New York, NY 10004
(646) 665-7599